IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| JEFFREY HALEY, | ) |
| | ) |
|     Petitioner-Plaintiff, | ) |
| | ) |
|     v. | ) |
| | ) |
| UNDER SECRETARY OF COMMERCE | )    Case No. 1:15-cv-102 (GBL/TRJ) |
| FOR INTELLECTUAL PROPERTY AND | ) |
| DIRECTOR OF THE USPTO, | ) |
| | ) |
|     Respondent, | ) |
| | ) |
| MICHELLE LEE AND SARAH HARRIS, | ) |
| | ) |
|     Defendants. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants Michelle Lee and Sarah Harris ("Defendants")'s Motion to Dismiss (Doc. 7) and Petitioner-Plaintiff Jeffrey Haley ("Haley")'s Cross-Motion for Partial Summary Judgment ("Cross-Motion") (Doc. 13). This case involves the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office ("the USPTO")'s decision to disbar Haley (Admin. R. at 9–24) as reciprocal punishment after Haley agreed to resign from the Washington State Bar Association ("the WSBA") in lieu of discipline (*Id.* at 28–31). Following disbarment, Haley jointly filed (1) a petition for review of the USPTO's disciplinary ruling and (2) a *Bivens* action ("Complaint") against Defendants.

There are five issues before the Court. One, whether the Court, given Haley's alternative means of redress and the practical implications of allowing such a suit, should grant Defendants' Motion to Dismiss because it would be inappropriate to devise a new *Bivens* remedy for Haley's

claims. Two, whether the Court should grant Defendants' Motion to Dismiss because Defendants are entitled to absolute immunity due to their quasi-judicial roles in adjudicating agency disciplinary actions. Three, whether the Court should grant Defendants' Motion to Dismiss because Defendants are entitled to qualified immunity as the constitutional right at issue was not clearly established at the time of the alleged misconduct. Four, whether the Court should grant Haley's Cross-Motion because the USPTO had no congressionally-granted authority to impose reciprocal discipline against Haley. Five, whether the Court should grant Haley's Cross-Motion because in punishing Haley, the USPTO exercised its authority in a manner that was arbitrary and capricious. For the reasons that follow, the Court must GRANT Defendants' Motion to Dismiss and the Court must DENY Haley's Cross-Motion.

## I. BACKGROUND

Petitioner-Plaintiff Jeffrey Haley was a patent attorney licensed to practice in the state of Washington and before the United States Patent and Trademark Office ("Patent Bar"), but in 2005 Haley decided to leave the law and work instead as a patent agent.[1] (Compl. ¶¶ 9–11). In 2006, Haley failed to pay dues or complete the required continuing legal education classes necessary for membership in the WSBA and the WSBA suspended him from practice. (*Id.* ¶ 12). That same year, Haley resigned from the law firm which he helped found. (*Id.* ¶ 14). When the firm refused to pay Haley his retirement, the parties entered arbitration. (*Id.* ¶ 15). While Haley eventually prevailed, he did not receive attorneys' fees. The contract at issue did not allow for such relief and accordingly, Haley incurred significant legal costs. (*Id.* ¶ 14–15). In 2013, Haley's former firm filed a complaint with the WSBA alleging that Haley had sent the firm a

---

[1] Patent attorneys and patent agents are both members of the Patent Bar. *See Kroll v. Finnerty*, 242 F.3d 1359, 1366 (Fed. Cir. 2001).

message which it believed constituted criminal extortion and therefore ethical misconduct under

the WSBA's rules. (*Id.* ¶ 17). The message allegedly read,

> I am not satisfied with the arbitrator's ruling on attorney fees. Giving all benefits of doubts, a reasonable person might consider it fair to award no attorney's fees for all litigation efforts through the summary judgment ruling. However, you should have promptly paid up after that ruling. All theories you asserted and all actions you took subsequently, including requesting extra time for discovery and then taking no discovery, were frivolous and appeared calculated merely to run up my attorney fees while you incurred no attorney fees.
>
> The additional fees I incurred after the summary judgment were $22,390, and the additional arbitration costs were $4,005, a total of $26,395.
>
> To treat me with minimal fairness, I demand that the firm pay me this amount.
>
> If you pay me $26,395, I will have no basis to warn patent lawyers that they should not do business with you. If you do not, I will exercise my duty to others and post the warning below in all suitable places on the web:
>
>> I was one of three founders of the Graybeal Jackson patent law firm in 1990. To minimize risk of wasteful disputes, we wrote a partnership agreement that spelled out with clear formulas who was entitled to how much money in all scenarios, including withdrawal or retirement.
>>
>> I was the de-facto managing partner from 1995 to 2004. When John Graybeal died, I ensured that the firm paid the appropriate amount to his estate based on the partnership agreement. When Larry Jackson retired, I ensured that the firm paid him the retirement amounts he was due based on the partnership agreement. There was not a single complaint or question raised in either case.
>>
>> But then, when I retired, with Josh King the leading partner, the firm refused to pay my retirement buy-out ("departure benefits" under the partnership agreement). The partners, Josh King, Dick Gray, Brian Santarelli, Paul Rusyn, and Kevin Jablonski, asserted frivolous legal theories why the departure benefits were not owed.
>>
>> Although my lawyer frequently solicited offers of payment for settlement, Josh King and the Graybeal firm partners offered nothing. A reasonable business person would have assessed the situation and made a reasonable offer. It appears that Josh King and his partners seek a reputation for a scorched-earth approach to any partner or employee who disagrees with them - not the sort of people you want to do business with.
>>
>> I was forced to take the matter all the way through arbitration. The arbitrator awarded my full retirement benefits to the penny. But I

> incurred $63,134 in attorney fees and $12,680 for arbitration costs, a total of $75,814, to recover the $129,667 that I was owed. Josh King represented the Graybeal firm so the firm incurred no legal fees while it was running up my bill.
>
> I write to warn associates and prospective partners of the risks of joining this firm, at least so long as Josh King, Dick Gray, Brian Santarelli, Paul Rusyn, and Kevin Jablonski make up a majority of the partners. Spending your money and energy in litigation is not worth the potential benefits.
>
> If you would like me to send you a copy of the arbitrator's ruling, please send an e-mail to haleyconsulting(at)gmail.com.

The WSBA filed a complaint against Haley alleging misconduct under the Rules of Enforcement Lawyer Conduct ("ELC") on August 14, 2013. (Admin. R. at 32–35). In Haley's response to the complaint he stated, "It is not worth the trouble for me to go through a disputed proceeding on this matter, so I hereby permanently resign my former membership which has been in suspension for more than seven years." (*Id.* at 36–37). After a series of negotiations with the WSBA which allowed him to resign without actually admitting to the wrongful conduct, Haley signed the Resignation in Lieu of Discipline (*Id.* at 28–31) pursuant to ELC Rule 9.3 (*Id.* at 39; *see* Compl. ¶¶ 19–22).

On June 20, 2014, the Director of the Office of Reciprocal Discipline ("OED") for the Patent Bar filed a complaint for reciprocal discipline against Haley pursuant to 37 C.F.R. § 11.24. (Admin. R. at 42–46). After Haley filed a response (*Id.* at 56–70), the USPTO weighed the arguments of Haley and OED and issued a final order (*Id.* at 9–25) on December 31, 2014 disbarring Haley. On January 26, 2015, Haley filed a joint petition for review of the USPTO's disciplinary order and complaint against the two officials who signed the order. Haley's Complaint alleged violation of his First Amendment and Fourteenth Amendment rights. (Doc. 1). On April 20, 2015, Defendants Michelle Lee and Sarah Harris filed a Motion to Dismiss (Doc. 7), and on April 24, 2015, Haley filed a Cross-Motion (Doc. 13).

4

## II. STANDARDS OF REVIEW

*12(b)(6) Motion to Dismiss*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted unless the complaint "states a plausible claim for relief" under Rule 8(a). *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In considering a rule 12(b)(6) motion, the court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). No such assumption of truth is afforded to those "naked assertions" and "unadorned conclusory allegations" devoid of "factual enhancement." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citations omitted). The complaint must contain sufficient factual allegations, taken as true, "to raise a right to relief above the speculative level" and "nudge [the] claims across the line from conceivable to plausible." *Vitol*, 708 F.3d at 543 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

*Review of Agency Action*

Summary judgment is appropriate where a court finds there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. However, "when a party seeks review of agency action under the APA before a district court, the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein,* 583 F.3d 860, 865 (D.C. Cir. 2009) (quotations omitted); *see Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993) ("[W]hen an agency action is challenged . . . the entire case on review is a question of law."). Therefore, when reviewing agency actions there is no genuine issue of material fact and judicial review is "confined to the agency's administrative record." *Am. Canoe*

*Ass'n, Inc. v. U.S. E.P.A.*, 46 F. Supp. 2d 473, 475 (E.D. Va. 1999) (citing *Camp v. Pitts,* 411 U.S. 138, 142 (1973)).

When reviewing agency decisions, the standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 192 (4th Cir. 2009). "Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 497 (2004) (citations omitted). However, the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The USPTO's disciplinary actions are subject to review by the United States District Court for the Eastern District of Virginia according to the provisions of the Administrative Procedure Act ("APA"). *See* 35 U.S.C. § 32 (setting the current forum for review of the USPTO's disciplinary actions as the Eastern District of Virginia); *Bender v. Dudas*, 490 F.3d 1361, 1365–66 (Fed. Cir. 2007) (explaining that review of agency discipline is evaluated under the APA, 5 U.S.C. § 706). Under the APA, "the agency's choice of sanction is held unlawful only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Bender*, 490 F.3d at 1365–66 (quoting 5 U.S.C. § 706).

### III. ANALYSIS

#### A. Defendants' Motion to Dismiss

The Court GRANTS Defendants' Motion to Dismiss because the Court will not devise a new *Bivens* claim and even if it did, Defendants would be entitled to either absolute or qualified

immunity.  Defendants move to dismiss counts II and III of Haley's Complaint[2] on three grounds.  First, Defendants argue that the Court should not adopt a new type of implied claim under *Bivens*.  Second, Defendants argue that they are entitled to absolute immunity because of their quasi-judicial roles in adjudicating agency disciplinary actions.  Third, Defendants argue that they are entitled to qualified immunity because the constitutional right at issue was not clearly established at the time of the alleged misconduct.

**1. The Court will not devise a new *Bivens* claim.**

The Court will not extend *Bivens* to cover claims brought for an infringement of First Amendment rights in the context of the present case because 35 U.S.C. § 32 provides Haley with an alternate means of redress, and because the special factor of exposing government officials to greater liability counsels against authorizing a new type of *Bivens* claim.  Defendants argue that this case does not pass the two-step analysis for devising a new *Bivens* remedy.  Haley argues that several courts have recognized *Bivens* claims under the First Amendment.

The Fourth Circuit has neither recognized a First Amendment cause of action under *Bivens*, nor has it expressly stated that such a claim is not cognizable. *See, e.g., Tobey v. Jones*, 706 F.3d 379, 404 n.* (4th Cir. 2013) (refusing to reach the question of whether the plaintiff's First Amendment cause of action would lie under *Bivens*); *Zimbelman v. Savage*, 228 F.3d 367, 370 (4th Cir. 2000) (holding that special factors counselled against recognizing a *Bivens* claim in plaintiffs' particular case).  Likewise, the Supreme Court has not, to this point, recognized a First Amendment *Bivens* claim. *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to the First Amendment.").  Haley argues that some courts, the District of Columbia Circuit in particular, have recognized *Bivens* actions brought under the First

---

[2] Count I of the Complaint is Haley's "Petition for Review" of the USPTO's disciplinary ruling. (Compl. ¶ 30).  As such, it does not relate to the *Bivens* claims against Defendants.  Count I is a separate issue that the Court will address below in Part B of its analysis.

Amendment. *See, e.g., Spagnola v. Mathis*, 809 F.2d 16, 19 (D.C. Cir. 1986); *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977). The question for the Court, however, is not whether First Amendment claims are ever cognizable under *Bivens*, but whether the Court should recognize a *Bivens* cause of action in *this* case. As Defendants correctly point out, the test for whether to devise a *Bivens* remedy involves two questions. First, whether the plaintiff has access to an alternate remedy; if the plaintiff has an alternate means of redress, then a *Bivens* claim is not appropriate. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). Second, if the plaintiff does not have alternate means of redress, whether "any special factors counsel[] hesitation before authorizing a new kind of federal litigation." *Id.*

**Alternate Remedy**

Haley has an alternate remedy because 35 U.S.C. § 32 grants Haley an opportunity to petition this Court for review of the USPTO's disciplinary decision; thus, the Court will not recognize his *Bivens* claim. The operative question for the Court is whether Congress created an exclusive remedy for the grievance that Haley seeks to redress. *See Richards v. C.I.A.*, 837 F. Supp. 2d 574, 578 (E.D. Va. 2011)

In *Zimbelman v. Savage*, two Air Force employees were fired on suspicion of theft and fraud following an investigation by the Air Force's Office of Special Investigations ("OSI"). 228 F.3d at 369–70. After failing in their initial appeals process, the ex-employees filed Fifth Amendment *Bivens* claims against members of OSI because they claimed that OSI did not provide them an opportunity for a name-clearing hearing. *Id.* at 369. The court held that because Congress provided an exclusive remedial framework—in the ex-employees' case it was the Civil Services Reform Act—a *Bivens* remedy for damages was inappropriate. *Id.* at 371.

8

Here, the U.S. Patent Act is analogous to the Civil Services Reform Act. *See Animal Legal Def. Fund v. Quigg*, 932 F.2d 920, 938 (Fed. Cir. 1991) ("The structure of the Patent Act indicates that Congress intended only the remedies provided therein to ensure that the statutory objectives would be realized."). Haley argues that because this Court's review of the USPTO's decision pursuant to 35 U.S.C. § 32 does not allow for damages, he does not have access to an alternate means of redress. While the Court appreciates Haley's point, it cannot simply supplement Congress' intended remedy. *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms . . . for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies."). The Supreme Court has held that "[s]o long as the plaintiff had an avenue for *some* redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) (emphasis added) (citing *Chilicky*, 487 U.S. at 425–427); see also *Iqbal*, 556 U.S. at 675 (noting that "implied causes of action are disfavored"). Because Haley has access to an alternate means of redress, Haley's claims fail the first part of the test for devising a *Bivens* remedy and the Court must dismiss his *Bivens* claims.

**Special Factors**

Even if Haley had no alternate remedy, under the second part of the *Bivens* analysis—the special factors test—the Court would not devise a new *Bivens* claim because opening up government officials to increased liability is a factor that counsels against authorizing a new type of federal litigation. "*Bivens* actions are inappropriate if there are 'special factors counseling hesitation.'" *Medley v. Hawk-Sawyer*, 133 F. Supp. 2d 883, 888 n.3 (N.D.W. Va. 2001) (quoting *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971)).

9

Widening the scope of government employees amenable to suit for their official acts is a factor weighing against this Court devising a new *Bivens* remedy. Defendants argue that the USPTO's disciplinary process provides an important public role, and that exposing government officials to greater liability could dissuade qualified individuals from seeking positions to serve that role. Their argument tracks the Supreme Court's opinion in *Schweiker v. Chilicky* where the Court noted that "[t]he prospect of personal liability for official acts, moreover, would undoubtedly lead to new difficulties and expense in recruiting administrators for the programs Congress has established." 487 U.S. at 425. Haley argues that exposing officials to greater liability would not dissuade qualified individuals from seeking government positions because those individuals "will not have to pay any damages awarded. Their employer will pay the damages for them," and that such a suit would be "undoubtedly very rare." (Doc. 21 at 17). Haley's argument does not persuade the Court. In *F.D.I.C. v. Meyer*, the Supreme Court declined to extend *Bivens* to cover agencies specifically because "we would be creating a potentially enormous financial burden for the Federal Government." 510 U.S. 471, 486 (1994).

It follows then that exposing federal employees—and by extension the federal government—to even more liability by allowing First Amendment *Bivens* suits stemming from agency disciplinary proceedings would be imprudent . While Haley claims that such a suit would be "undoubtedly very rare," it would seem an attractive option for anyone challenging an agency disciplinary decision to tack on a *Bivens* claim as Haley has done here. Therefore, because special factors counsel hesitation in devising a new *Bivens* remedy, Haley's claims fail the second part of the *Bivens* analysis in addition to the first, and the Court will not devise a new *Bivens* remedy. Thus, Haley does not state a claim under *Bivens* and the Court grants Defendants' Motion to Dismiss.

**2. Defendants are entitled to absolute immunity.**

Even if the Court were to devise a new claim under *Bivens*, Defendants would not be liable to suit under the doctrine of absolute immunity. Defendants argue that due to their quasi-judicial roles, absolute immunity should insulate them from liability. Haley argues that because there were no "parties on each side presenting evidence and making arguments" there was no quasi-judicial proceeding and Defendants did not act in quasi-judicial roles.

Absolute immunity protects some government officials from suit when acting within the scope of their duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). "The purpose of absolute immunity 'is not to protect an erring official, but to insulate the decision-making process from the harassment of prospective litigation.'" *Goldstein v. Moatz*, 364 F.3d 205, 212 (4th Cir. 2004) (quoting *Westfall v. Erwin*, 484 U.S. 292, 295 (1988)). In *Butz v. Economou*, Respondent brought suit against high-level United States Department of Agriculture officials alleging that they violated his constitutional rights by bringing an investigation against him in retaliation for comments he made about the agency. 438 U.S. 478, 480 (1978). The Court held that while some of the officials could only raise the standard *Bivens* defense of qualified immunity, others, such as the hearing examiner acting in a quasi-judicial role, were entitled to absolute immunity. *Id.* at 513–14. The Court stated that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Id.* at 512–13.

Haley's case is similar to *Butz*. Haley, upset by an agency decision, sued high-level Patent Bar officials alleging violation of his constitutional rights. Unlike in *Butz*, though, Haley only sued officials who adjudicated the claim against him.[3] Thus, he only sued those who were

---

[3] Defendant Harris, General Counsel for the United States Patent and Trademark Office, signed the order disbarring Haley on behalf of Defendant Lee. Their only involvement in this case was related to the quasi-judicial process that

entitled to absolute immunity. Haley's argument that there was no quasi-judicial proceeding because there were no "parties on each side presenting evidence and making arguments" is particularly ill-conceived in light of his years practicing law. OED filed a complaint. (Admin. R. at 42–46). The USPTO issued a notice and order to respond. (*Id.* at 48–50). The USPTO granted Haley a time extension to file his response. (*Id.* at 53–54). Haley responded. (*Id.* at 56–70). The USPTO, weighing the arguments of Haley and OED, issued an order. (*Id.* at 9–24). Clearly the process was akin to that of a court. Because Haley is only suing Defendants in relation to their capacity as adjudicators in his disciplinary proceeding, Defendants are entitled to absolute immunity. Therefore, the Court must grant Defendants' Motion to Dismiss because Haley cannot state a plausible claim for relief.

### 3. Defendants are entitled to qualified immunity.

Even if the Court were to accept Haley's *Bivens* claim and Defendants were not entitled to absolute immunity, Defendants would still be entitled to qualified immunity. Defendants argue that because there was no clearly established constitutional right at the time of their conduct, they are entitled to qualified immunity. Haley does not contest the qualified immunity issue, but the Court will address it summarily. The first step in the qualified immunity analysis is to ask whether the plaintiff has alleged the deprivation of a constitutional right. *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

Here, Haley attempts to make out claims that Defendants violated his First Amendment free speech and Fourteenth (Fifth) Amendment due process rights. It is difficult to see how Defendants' actions regulated Haley's speech at all. The USPTO disbarred Haley under a mandatory reciprocal discipline rule set forth in 37 C.F.R. § 11.24. The disbarment related to

---

took place pursuant to 37 C.F.R. § 11.24. That process is laid out in the Administrative Record at 42–46, 48–51, 53–54, 56–70, and 9–24.

Haley's Resignation in Lieu of Discipline, not to the speech underlying the original WSBA misconduct complaint. (*See* Admin. R. at 17 ("This reciprocal discipline proceeding is not regulating Respondent's underlying speech, but rather is considering reciprocal discipline as a result of his Resignation in Lieu of Discipline.")). Haley's due-process argument is completely unsupported. Due process requires notice and an opportunity to be heard. *See Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). The USPTO gave Haley notice and an opportunity to respond to the allegations in the complaint. (Admin. R. at 48–51). The USPTO gave Haley a time extension to file his response. (*Id.* at 53–53). Haley responded. (*Id.* at 56–70). Haley, possibly seeing the futility of his due-process claim, does not address it at all after the Complaint. There is no reading of facts in the 37Administrative Record that support a conclusion that Defendants deprived Haley of any constitutional right. Therefore, if it were needed, Defendants would be entitled to qualified immunity. The Court must GRANT Defendants' Motion to Dismiss because Haley cannot state a plausible claim for relief.

## B. Haley's Cross-Motion

The Court DENIES Haley's Cross-Motion because it finds that Congress implicitly granted the USPTO the power to reciprocally discipline its members, and because it finds that the USPTO's exercise of that power was not arbitrary and capricious. Haley's Cross-Motion focuses largely on free speech and on the USPTO's duty to investigate the WSBA's case against him. (*See* Doc. 12–17). However, this Court's review of the regulation under which the USPTO disciplined Haley is limited. With that in mind, the Court sees two questions. First, whether Congress intended to permit the USPTO to impose reciprocal discipline. Second, whether the USPTO acted in a way that was "arbitrary and capricious."

**1. Scope of the USPTO's Authority**

The USPTO did not act outside the scope of its authority in adopting reciprocal discipline because Congress gave the USPTO wide latitude to govern the conduct of the members of its bar. The USPTO disciplined Haley under 37 C.F.R. § 11.24, which lays out the rules for reciprocal discipline in the Patent Bar. (Admin. R. at 9–24). Normal review of a USPTO disciplinary action is governed under the APA's "arbitrary and capricious" standard. *Bender v. Dudas*, 490 F.3d 1361, 1365–66 (Fed. Cir. 2007). However, Haley argues that the USPTO's actions fell outside the scope of its congressionally-granted authority because "there is no statute which authorizes the Director to punish a patent agent who settles with a Bar Association rather than litigate with the Bar Association." (Compl. ¶ 31). Thus, the Court will first look at whether 37 C.F.R. § 11.24 is permissible under the relevant enabling statute, 35 U.S.C. § 32. The Court examines an agency's construction of its enabling statute under the test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1974).

The *Chevron* test is a two-part inquiry: (1) whether Congress unambiguously spelled out its answer to the question at issue and (2) if not, whether the agency's "answer is based on a permissible construction of the statute." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011). "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Id.* at 843. (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).

Here, the language of the enabling statute, 35 U.S.C. § 32, does not refer to the USPTO discipline required when an agent resigns from another bar association in lieu of discipline specifically, or even to reciprocal discipline generally; instead, the relevant language provides,

14

> The Director may, after notice and opportunity for a hearing, suspend or exclude, either generally or in any particular case, from further practice before the Patent and Trademark Office, any person, agent, or attorney shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations established under section 2(b)(2)(D) . . . .

35 U.S.C. § 32. Congress does not specify what it means by "incompetent or disreputable." By failing to expound on language like "incompetent or disreputable," Congress *implicitly* leaves a gap for the USPTO to fill as it sees fit. Congress also *explicitly* gives the USPTO the power to promulgate regulations related to the conduct of its members. *See* 35 U.S.C. § 2(b)(2)(D) ("The Office . . . may establish regulations, not inconsistent with law, which . . . may govern the recognition *and conduct* of agents, attorneys, or other persons representing applicants or other parties before the Office . . . ." (emphasis added)). It is clear that Congress, far from specifically addressing the reciprocal disbarment question at issue here, gives the USPTO a wide berth to govern the conduct of the members of its bar.[4] The question then becomes, as per the second part of the *Chevron* test, whether the USPTO's adoption of reciprocal disbarment is based on a permissible construction of the statute.

The focus is not whether 37 C.F.R. § 11.24 is appropriate, but whether the USPTO's view that it is appropriate is a reasonable one. *See Chevron*, 467 U.S. at 845. The Court will "afford 'controlling weight' to an agency's reasonable interpretation even where [it] would have, if writing on a clean slate, adopted a different interpretation." *Nat'l Elec.*, 654 F.3d at 505 (citing *Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998)). This deference makes sense both because agencies have an expertise in their areas that courts do not, and because agencies have a role to play in the political sphere that courts do not. *Chevron*, 467 U.S. at 865–66 ("[F]ederal judges—

---

[4] It is significant that neither statute referenced above distinguishes between how the USPTO may govern or punish patent agents and how it may govern or punish patent attorneys. While Haley's disinterest in the legal profession may serve to explain why he stopped paying dues to the WSBA and why later he resigned from the WSBA rather than fighting allegations of misconduct, it does not afford him any lower level of scrutiny by the USPTO.

who have no constituency—have a duty to respect legitimate policy choices made by those who do.").

In the present case, the Court finds that the USPTO's regulation on reciprocal discipline is a more than reasonable construction of 35 U.S.C. § 32. The regulation mandates that "[a] practitioner is deemed to be disbarred if he or she . . . has resigned in lieu of a disciplinary proceeding," and it calls for reciprocal discipline from the USPTO. 37 C.F.R. 11.24(a), (d)(1). The USPTO cites multiple examples of bars and courts, including this Court, where a resignation in lieu of disciplinary proceedings from another bar is grounds for reciprocal disbarment. (Doc. 5 at 13–14; *see* Admin. R. 16–17). Even a passing search turns up many more examples. *See* Lori Jean Henkel, Annotation, *Propriety of attorney's resignation from bar in light of pending or potential disciplinary action*, 54 A.L.R.4TH 264 (1987). The Model Federal Rules of Disciplinary Enforcement Rule 3(a) requires disbarment where an attorney "resign[s] from the bar of any other Court of the United States or the District of Columbia, or from the Bar of any state, territory, commonwealth or possession of the United States while an investigation into allegations of misconduct is pending." 35 U.S.C. § 32 gives the USPTO the power to discipline members of the Patent Bar. It is clear that, even absent the high level of deference the Court must give the USPTO under *Chevron*, 37 C.F.R. § 11.24 is not an unreasonable or even unexpected construction of 35 U.S.C. § 32. Therefore, the USPTO did not exceed the scope of its congressionally-granted power in adopting reciprocal discipline.

## 2. Arbitrary and Capricious Standard

The USPTO's application of 37 C.F.R. § 11.24 was not arbitrary and capricious. Haley argues if the USPTO acted within the scope of its authority, then it did not properly apply 37 C.F.R. § 11.24. (*See* Doc. 13 at 14–17). The Court's review of an agency's application of its

16

own regulation falls under the "arbitrary and capricious" standard set forth in the APA. *See* 5 U.S.C. §§ 702, 706. "Review under [the APA] is highly deferential, with a presumption in favor of finding the agency action valid. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)). In evaluating an agency action under the arbitrary and capricious standard, the Court will only reverse where there has been a "clear error of judgment." *Voge v. Sec'y of Navy*, 35 F.3d 558 (4th Cir. 1994) (citations omitted).

Here, 37 C.F.R. 11.24 states that "[a] practitioner is deemed to be disbarred if he or she . . . has resigned in lieu of a disciplinary proceeding." Not only was the document that Haley signed with the WSBA entitled "Resignation in Lieu of Discipline," the parties also agreed to it pursuant to terms of ELC Rule 9.3 which required that if Haley was ever allowed to reapply for membership with the WSBA, the WSBA would treat Haley as "one who has been barred for ethical misconduct." (Admin. R. at 39). It further stated that Haley acknowledges "that the resignation could be treated as disbarment by all other jurisdictions" and that he must "comply with all restrictions that apply to a disbarred lawyer." *Id.* Haley's argument that he was not disbarred for the purposes of 37 C.F.R. § 11.24 is thus without merit.

The regulation then requires the USPTO to impose identical punishment unless it "finds there is a genuine issue of material fact that":

(i)     The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process;

(ii)    There was such infirmity of proof establishing the conduct as to give rise to the clear conviction that the Office could not, consistently with its duty, accept as final the conclusion on that subject;

(iii)   The imposition of the same public censure, public reprimand, probation, disbarment, suspension or disciplinary disqualification by the Office would result in grave injustice; or

(iv)    Any argument that the practitioner was not publicly censured, publicly reprimanded, placed on probation, disbarred, suspended or disciplinarily disqualified.

Haley argues that the USPTO should have found a genuine issue of material fact under points (ii) and (iii). (Compl. ¶¶ 34–35). The Court will address each in turn.

**Infirmity of Proof**

There was not such a dearth of proof establishing Haley's conduct that the USPTO could not accept the WSBA's final conclusion. Haley argues that because the WSBA did not investigate the complaint "there was a complete infirmity of proof because there was no admissible evidence produced to support the bare allegation of wrongdoing." (*Id.* ¶ 35). The USPTO argues that because Haley voluntarily accepted the WSBA's punishment, the WSBA had no further need for an investigation. (Admin. R. at 18).

Case law supports the USPTO's position. In *In re Day*, Respondent voluntarily resigned from the Florida Bar rather than contesting allegations of misappropriations of client trust account funds. 717 A.2d 883, 884 (D.C. 1998). Pursuant to a mandatory reciprocal discipline rule in the Rules of Professional Conduct, the Board of Professional Responsibility recommended that the District of Columbia Court of Appeals disbar Respondent from the District of Columbia Bar. *Id.* Respondent argued that because the Florida Bar never completed its investigation of Respondent, there was an infirmity of proof in establishing the conduct that would call for her reciprocal disbarment. *Id.* at 888. The court rejected Respondent's argument because it found that Respondent's actions created the infirmity of evidence. *Id.* at 888–89.

Similarly, because Haley voluntarily resigned from the WSBA and agreed not to seek reinstatement, the WSBA would have no reason to continue its investigation. As Haley put it, "This is exactly what he wanted—permanent disengagement with the WSBA." (Compl. ¶ 22). If

there were an infirmity of evidence, it would be the result of Haley's own actions. However, the facts stated in the Administrative Record supply more than enough evidence to allow the USPTO to find against Haley.

It was not for the USPTO to adjudicate the WSBA's misconduct complaint against Haley. Its only question was whether there "was *such infirmity* of proof establishing the conduct as to give rise to the *clear conviction* that the Office *could not*, consistently with its duty, accept as final the conclusion on that subject." 37 C.F.R. § 11.24 (emphasis added). Here, Haley does not deny that the arbitrator's final word gave him no right to attorneys' fees, nor does he deny that he sent his old partners a message which read, "If you pay me $26,395 I will have no basis to warn patent lawyers that they should not do business with you." Haley correctly points out that in the state of Washington, free speech provides a defense to extortion where clear evidence shows that a sufficient nexus exists between a threat and a plausible claim of right. *State v. Pauling*, 69 P.3d 331, 332 (Wash. 2003). It is clear from Haley's Complaint, however, that he had absolutely no claim of right to attorneys' fees. (Compl. ¶ 14) ("The partnership agreement provided for arbitration of disputes but did not provide for attorney fees to the prevailing party."). The USPTO, therefore, made no clear error of judgment in failing to find a genuine issue of material fact regarding infirmity of proof.

**Grave Injustice**

The USPTO's finding that imposition of equivalent punishment would not have resulted in grave injustice was reasonable. Haley argues that because the WSBA did not determine what Haley's punishment would have been had it found against him, it was not fair to impose the harshest penalty possible. (*Id.* ¶ 35). The USPTO argues that when Haley voluntary chose to

resign in lieu of discipline he had notice that the USPTO's reciprocal discipline regulation would treat it as disbarment. (Doc. 5 at 17–18).

In *In re Davy*, Respondent argued that an imposition of reciprocal discipline would result in grave injustice because there had been a seven-year delay from the original imposition of discipline. 25 A.3d 70, 73 (D.C. 2011). The District of Columbia Court of Appeals held that because it was Respondent's own failure to disclose the grievances pending against her that caused the delay, imposition of identical discipline would not constitute a grave injustice. *Id.* at 74.

Similarly, to the extent that the harshest punishment possible was an unjust result of Haley's actions, Haley has no one to blame but himself. Haley signed a document that specifically stated that his resignation could be treated as disbarment "by all other jurisdictions." (Admin. R. at 39). The WSBA suspended Haley for failure to pay dues or attend continuing legal education classes. Haley resigned facing allegations of extortion. Given the circumstances, the USPTO's view that reciprocally disbarring Haley did not constitute grave injustice was not a clear error of judgment. While the Court sympathizes with Haley, under the arbitrary and capricious standard of the APA, the Court cannot, in this case, overturn the USPTO's application of its own regulation. The Administrative Record simply does not bear out a clear error of judgment. Therefore, the Court must DENY Haley's Cross-Motion.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss and the Court denies Haley's Cross-Motion. The Court finds it inappropriate to recognize a new type of *Bivens* claim and even if it did, Defendants would be entitled to immunity. Furthermore, the USPTO

had congressional authority to promulgate 37 C.F.R. § 11.24 and its application of it was not arbitrary and capricious.  Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (Doc. 7) is **GRANTED** on all counts and

**ORDERED** that Haley's Cross-Motion for Partial Summary Judgment (Doc. 13) is **DENIED**.

**IT IS SO ORDERED.**

ENTERED this _____ day of September, 2015.

Alexandria, Virginia

9/ _8_ /2015

_____ /s/
Gerald Bruce Lee
United States District Judge